803 F.2d 1411
 25 ERC 1206, 17 Envtl. L. Rep. 20,174
 CITY OF DETROIT, a Michigan municipal corporation, By and
Through DETROIT WATER AND SEWERAGE DEPARTMENT,
Plaintiff-Appellant,
v.
STATE OF MICHIGAN, MICHIGAN DEPARTMENT of TRANSPORTATION,
COUNTY of WAYNE, Defendant,
Wayne County Road Commission, Defendant-Appellee.
 No. 85-1030.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 13, 1986.
Decided Oct. 21, 1986.
 
 James A. Hourihan (argued), David F. Grady, Hogan & Hartson, Washington, D.C., for defendant-appellee.
 Lynn Ferris, Detroit, Mich., Robert Walter (argued), for plaintiff-appellant.
 Before ENGEL and MILBURN, Circuit Judges, and CONTIE,* Senior Circuit Judge.
 ENGEL, Circuit Judge.
 
 
 1
 The principal issue here is whether the City of Detroit, through the Detroit Water and Sewerage Department, may charge Wayne County Road Commission for a portion of the cost associated with storm water that runs off Wayne County Road Commission roads in the City of Detroit and flows into the City's treatment system. On cross-motions for summary judgment, the district court rejected several theories advanced by the City to support such charges and therefore granted judgment in favor of the Wayne County Road Commission. See City of Detroit v. Michigan, 594 F.Supp. 574 (E.D.Mich.1984). Because we conclude that the City of Detroit has a right to levy such charges under Michigan's Revenue Bond Act of 1933, Mich.Comp.Laws Ann. Secs. 141.101-.139, we reverse.
 
 I.
 
 2
 The material facts in this case are largely undisputed. The City of Detroit, through the Detroit Water and Sewerage Department (DWSD), owns and operates a combined wastewater treatment system located within the City of Detroit. This combined system, which serves much of southeastern Michigan, funnels storm water runoff and sewage through a common system.
 
 
 3
 The Wayne County Road Commission (WCRC) has established roads under its jurisdiction which are located within the corporate boundaries of the City of Detroit. WCRC assumed jurisdiction over the first of these Detroit roads in 1912, and last assumed jurisdiction over a road in Detroit in December of 1965. WCRC presently maintains over 83.28 linear miles of roads located within the City of Detroit. All parties agree that WCRC has a statutory duty to keep the roads that it maintains "in reasonable repair, so that they shall be reasonably safe and convenient for public travel...." Mich.Comp.Laws Ann. Sec. 224.21. Both parties also agree that this duty requires WCRC to provide adequate and appropriate drainage for roads under its jurisdiction. WCRC further states, although it has provided drainage by differing methods, drainage for at least some of its roads has been obtained by tapping into the DWSD sewer system.
 
 
 4
 Prior to 1940, the City of Detroit's sewage system was fairly primitive: sewage, industrial waste, and storm water were transported directly through the sewer system into the Detroit River without receiving any treatment. In May of 1940, however, Detroit began operating its first wastewater treatment plant which provided for the primary treatment of flows received at that plant. At that time, the rates that were charged to users were assessed on the basis of water usage. This rate system amounted to an across-the-board flat rate for all users based upon water consumption. There were no subclasses or differentials between residential and nonresidential users within the City of Detroit. In addition, no charges were assessed to any user of the Detroit sewerage system for storm water flows. As a result, WCRC was not charged for such runoff at any time prior to January 1, 1980. Nor has the City of Detroit paid DWSD for the treatment of storm water runoff from City streets.
 
 
 5
 In 1977, the Environmental Protection Agency (EPA) sued the City of Detroit, DWSD, and the State of Michigan, alleging that Detroit's sewage system did not satisfy the requirements of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. Sec. 1251 et seq.[1] See United States v. City of Detroit, No. 77-71100 (E.D.Mich.) (pending). Following negotiations among the parties, a consent judgment was entered by the district court, requiring the City to adopt a user charge system and have it fully implemented and effective on all bills after January 1, 1980.
 
 
 6
 A rate plan was adopted by the Detroit City Council on September 19, 1979, and was later approved by the EPA. On October 4, 1979, the district court took jurisdiction over all challenges to this plan and ordered that "all users, customers and rate payers of the system" would be bound by the results of any challenges unless they notified the court of their desire to opt out. Order Re: Rate Challenges, United States v. City of Detroit, No. 77-71100 (E.D.Mich. Oct. 4, 1979). Prior to a hearing on these challenges, the parties reached a settlement agreement, which was filed with the district court on June 30, 1980. On August 26, 1980, the district court ordered that "all users, customers and rate payers of DWSD's sewage system shall be bound by the Settlement Agreement." Order of Dismissal Re: Rate Challenges, United States v. City of Detroit, No. 77-71100 (E.D.Mich. Aug. 26, 1980).
 
 
 7
 On March 9, 1981, the district court assumed ancillary jurisdiction over challenges to treatment rates that were to become effective on July 1, 1981, again ordering that "users, customers and rate payers of the system" would be bound by the proceedings unless they opted out. Order Re: Rate Challenges, United States v. City of Detroit, No. 77-71100 (E.D.Mich. March 9, 1981). After challenges were filed, the parties reached an amicable settlement agreement. Users, customers, and rate payers of the system were afforded an opportunity to object to this agreement, and an order was later issued providing that the terms of the agreement were "binding upon the DWSD and all customers, users, and rate payers." Order of Dismissal Re: Rate Challenges, United States v. City of Detroit, No. 77-71100 (E.D.Mich. July 21, 1982).
 
 
 8
 On January 1, 1980, DWSD began charging WCRC the cost for storm water treatment for runoff from its roads. To compute this charge for 1980-81 and subsequent years DWSD first estimated the system's total cost that was attributable to storm water runoff within the City of Detroit. This cost was then allocated between three classes: residential water users, nonresidential users, and state and county roads, based on their relative impervious acreage.[2] WCRC, however, has refused to pay any storm water runoff charge, claiming that storm water that runs off its roads is not attributable to WCRC and that WCRC should not be considered a "user" of Detroit's treatment facility.
 
 
 9
 Thereafter, the City of Detroit and DWSD commenced this action in the United States District Court for the Eastern District of Michigan seeking recovery of storm water treatment charges from WCRC. The City claimed that it was entitled to have a contract implied as a matter of law for payment of these charges and, alternatively, that the Revenue Bond Act of 1933, Mich.Comp.Laws Ann. Sec. 141.118 (1979), created an obligation upon WCRC to pay the charges properly assessed.[3] By way of counterclaim, WCRC contended that, if it was deemed a "user" of the Detroit Wastewater Treatment System, the storm water treatment rates should be deemed arbitrary and capricious and violative of the proportionality requirement of section 204 of the FWPCA, 33 U.S.C. Sec. 1284(b)(1)(A). The City in turn asserted that WCRC was collaterally estopped from challenging rates settled by two prior rate settlement agreements entered by the district court in United States v. City of Detroit, No. 77-71100. The district court's ancillary jurisdiction was properly invoked over the City's state law claims against WCRC.[4] The case was then submitted to the district court on cross-motions for summary judgment. Upon reviewing the papers, depositions, and interrogatories filed by the parties, the district court concluded that "even if the record is viewed in the light most favorable to Plaintiffs, Plaintiffs clearly have not raised a genuine issue with respect to any material fact." City of Detroit v. Michigan, 594 F.Supp. at 575. The court therefore granted WCRC's motion for summary judgment and dismissed the City's complaint. Thereafter, on November 19, 1984, the City filed a motion for reconsideration which was denied in a written memorandum and order on December 11, 1984. The City then filed a timely notice of appeal on December 31, 1984.
 
 II.
 
 10
 Although the City has raised a number of arguments on appeal in support of its contention that the district court erred in dismissing its claims on the ground that the City had raised no genuine issue of fact, we address the narrow issue of whether the Revenue Bond Act of 1933, Mich.Comp.Laws Sec. 141.118, permits the City to charge WCRC the cost of treating WCRC's storm water runoff and also requires WCRC to pay these costs. In addressing this issue, we are, of course, bound by Michigan law.
 
 A.
 
 11
 "Michigan's Revenue Bond Act of 1933 "authorize[s] public corporations to purchase, acquire, construct, improve, enlarge, extend, or repair public improvements ... [and] to provide for the imposition and collection of charges, fees, rentals, or rates for the services, facilities, and commodities furnished by such public improvements...." The Act defines "public improvements" as including: "sewage disposal systems (including all sanitary sewers, combined sanitary and storm sewers, plants, works, instrumentalities and properties used or useful in connection with the collection, treatment and/or disposal of sewage and/or industrial wastes)...." Mich.Comp.Laws Ann. Sec. 141.103(b). The Act also governs the rates for services furnished by a public improvement, requiring that "[t]he rates shall be sufficient to provide for the payment of the expenses of administration and operation and the expenses of maintenance of the public improvement as may be necessary to preserve the same in good repair and working order...." Mich.Comp.Laws Ann. Sec. 141.121. Finally, section 18 of the Act states:
 
 
 12
 Free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality. The reasonable cost and value of any service rendered to a public corporation, including the borrower, by a public improvement shall be charged against the public corporation and shall be paid for as the service accrues from the public corporation's current funds or from the proceeds of taxes which the public corporation, within constitutional limitations, is hereby authorized and required to levy in an amount sufficient for that purpose, or both, and such charges, when so paid, shall be accounted for in the same manner as other revenues of the public improvement.
 
 Mich.Comp.Laws Ann. Sec. 141.118.[5]
 
 13
 There is apparently no dispute that the construction of the City of Detroit's wastewater treatment plant was financed, at least in part, by revenue bonds issued in accordance with the Revenue Bond Act of 1933. It is also undisputed that, for at least some of WCRC's roads, storm water "drainage has been obtained by tapping into the DWSD sewer system." Appellees' Brief at 6. The only question, therefore, is whether the use of the DWSD sewer system for such storm water drainage and treatment constitutes "any service rendered" within the meaning of section 18 of the Revenue Bond Act. The district court answered this question in the negative, holding:
 
 
 14
 The suggestion that this statute creates some obligation--either statutory or quasi contractual--on the part of WCRC can be quickly dismissed for reasons already discussed. As stormwater that runs off the roads is not fairly attributable to WCRC, Plaintiffs are not furnishing or rendering a service to WCRC. Consequently, the statute creates no obligation on the part of WCRC to pay for this service.
 
 
 15
 594 F.Supp. at 578 (emphasis in original).
 
 
 16
 Among the "reasons already discussed" by the district court was its belief that WCRC "receives [no] benefit from the treatment of storm water simply because some of that water runs off WCRC's roads before entering the sewer system. As Plaintiffs concede, WCRC does not create this volume of flow and cannot be held directly responsible for it." 594 F.Supp. at 577. The district court found support for this view in Hotel Employers Ass'n v. Gorsuch, 669 F.2d 1305, 1309 (9th Cir.1982), where the Ninth Circuit noted that "surface run-off cannot be fairly ascribed to individual land-owners' 'use' of the treatment system. Nature's whims and not land-owners' actions determine where and how much rainfall descends upon the City." 594 F.Supp. at 577. In addition, the district court found that it would be inequitable to require WCRC to pay for treatment of water that runs off its roads within the City, especially where the City itself had never paid for storm water running off City streets, id. at 577, and where, for the preceding forty years, DWSD had never charged WCRC for the cost of storm water running off WCRC roads. Id. at 578. The court therefore concluded that "(1) Plaintiffs have not conferred a benefit upon WCRC; and (2) even if Plaintiffs' services were for WCRC's benefit, equity does not require WCRC to provide compensation." Id.
 
 
 17
 We believe that the district court's analysis and conclusion here, at least as it pertains to the City's claim under section 18 of the Revenue Bond Act of 1933, was in error. Initially, we note that, although equitable considerations may be appropriate in the context of implied-in-law contracts, such considerations are not effective in the face of plain and unambiguous statutory language. Indeed, as the Michigan Supreme Court stated:
 
 
 18
 The claim of defendant that since plaintiff has chosen an equity court to try the case the question presented should be considered from an equitable viewpoint, and that the division under the statute is grossly inequitable, is not effective. Courts of equity, as well as of law, must apply legislative enactments in accord with the plain intent of the legislature.
 
 
 19
 City of Lansing v. Township of Lansing, 356 Mich. 641, 650, 97 N.W.2d 804, 809 (1959) (citations omitted). See United States v. Haddix & Sons, Inc., 415 F.2d 584, 588-89 (6th Cir.1969). Even assuming that equitable considerations are appropriate in the context of unambiguous statutory rights and responsibilities, we are not convinced that the so-called inequities discussed by the district court here would, or should, preclude the City from charging the WCRC for treatment of storm water that runs off its roads within the City. It may be true that the City has never charged itself a rate covering the costs associated with its own storm water runoff, but of course it remains primarily liable on the revenue bonds themselves in any event. Nor are we told how the City's failure to charge itself is relevant to WCRC's own responsibility should it otherwise be found liable under the statute for services rendered. Moreover, this precise argument was raised before the Supreme Court of Pennsylvania in Gericke v. City of Philadelphia, 353 Pa. 60, 44 A.2d 233, 237 (1945). There, the court responded:
 
 
 20
 Appellant complains that the city does not collect from itself an annual charge for the use of the sewers, but suggests no legal reason why the city, which owns and operates the system, should take money from its taxpayers and, with it, pay itself for the use of its own sewers. The situation is not within the rule that a public utility corporation may not render free service to a patron.
 
 
 21
 (citations omitted). We think that this reasoning is equally applicable here.
 
 
 22
 The district court also found that it would be inequitable to permit the DWSD to charge WCRC for storm water runoff into the City's sewers when no such charges had been made in the past. No cases are cited in support of this position. On the contrary, this precise argument was raised and rejected by the Missouri Supreme Court in City of Maryville v. Cushman, 363 Mo. 87, 249 S.W.2d 347 (1952). After citing several cases from several different jurisdictions, the court noted:
 
 
 23
 The rule of the above cited cases is that the original construction of a sewerage system does not bind the city to forever maintain it from general taxation, nor may it be implied that a citizen may forever use the sewerage system without charge, and that a charge may therefore be made for the use of the sewerage facility, "a benefit distinct from that originally conferred by building it." The respondent city by heretofore maintaining its sewerage system through taxation did not impliedly or otherwise bind itself never to charge for its use. Such sewerage charges are but charges for a service rendered.... The 1951 Act in Section 250.120 makes it the mandatory duty of a city which issues such revenue bonds "to fix and maintain rates and make and collect charges for the use and services of the (sewerage) system," etc. and it is of no consequence whatever that the city had theretofore exacted no service charge for the use of such system. This contention is without merit and must be denied.
 
 
 24
 249 S.W.2d at 351 (emphasis added).
 
 
 25
 We also find it significant that the reasons for not charging WCRC for storm water runoff in the past have dramatically changed since the City of Detroit was ordered to upgrade its sewer system, at great cost no doubt, in compliance with the Clean Water Act, 33 U.S.C. Sec. 1251 et seq. As the City points out in its brief:
 
 
 26
 The level of treatment first rendered in 1940 by Detroit's original wastewater treatment plant provided for primary treatment only. This less sophisticated primary treatment did not approach the advanced level of secondary treatment now provided by the Detroit Wastewater Plant. This dramatic increase in level of treatment of sewage was required by virtue of the Clean Water Act, 33 U.S.C.S. 1251 et seq. (Law.Co-op.1980). It was the effluent requirements of this law which were continuously violated by Detroit throughout the 1970's. As a result of the Act and the Consent Judgment entered by this Court in 1977 Detroit was required to make massive improvements to provide full secondary treatment to flows received at its plant. Detroit achieved this goal by June 1, 1980.
 
 
 27
 It is against these facts that the City of Detroit believed it mandatory, lawful and appropriate to abandon defining customers narrowly, billing only those entities with metered water consumption, and deemed it necessary to assess storm water charges to other users and customer classes as treatment costs rose dramatically, in order to pay for the required improvements mandated by law. These improvements were financed by revenue bonds supported by user and customer rates and state and federal grants. It is likewise against this background, evidencing the increase in services by virtue of legally mandated secondary treatment rendered to WCRC flows, that the City deemed it appropriate to charge WCRC storm water treatment charges.
 
 
 28
 Appellant's Brief at 38. We agree and conclude that it was error for the district court to rely on the "equitable considerations" when it concluded that section 18 of the Revenue Bond Act does not create an obligation on the part of WCRC to pay for storm water runoff. These considerations are simply not relevant to the issue of whether DWSD renders a service to WCRC.
 
 B.
 
 29
 The district court, however, also concluded that, "[a]s storm water that runs off the roads is not fairly attributable to WCRC, Plaintiffs are not furnishing or rendering a service to WCRC." 594 F.Supp. at 578. This conclusion is apparently based upon the district court's view that because WCRC does not create the volume of flow, it cannot be held directly responsible for it and therefore receives no benefit from the treatment of storm water simply because some of that water runs off WCRC roads before entering the City's sewer system. Id. at 577. The only authority cited by the district court to support this conclusion is the Ninth Circuit's Hotel Employers Ass'n v. Gorsuch, 669 F.2d 1305, 1309 (9th Cir.1982), where the court observed that "surface run-off cannot be fairly ascribed to individual land-owners' 'use' of the treatment system. Nature's whims and not land-owners' actions determine where and how much rainfall descends upon the City." 594 F.Supp. at 577.
 
 
 30
 We believe that the district court's reliance on this decision is misplaced. The issue in Hotel Employers Ass'n was whether the district court erred in concluding that the EPA administrator did not act arbitrarily and capriciously in approving a city sewer charge system which had been adopted in order to comply with federal regulations under the Federal Water Pollution Control Act. In contrast, the issue here is whether the district court erred in concluding that the disposal and treatment of storm water runoff from WCRC's roads located within the City of Detroit does not constitute a "service rendered" within the meaning of state law. In addition, the language relied upon by the district court was merely dictum and was set in the context of what constituted a "use" of a treatment system for purposes of apportioning the cost of treating surface runoff within the meaning of section 204(b) of the FWPCA, 33 U.S.C. Sec. 1284(b)(1)(A). Here, by contrast, even if we assume that the treatment of surface runoff is not a "use" within the meaning of the FWPCA, an issue we need not decide, it would not necessarily follow that the treatment of such runoff is not a "service rendered" within the meaning of the Michigan Revenue Bond Act.
 
 
 31
 We believe that an examination of the facts of this case clearly demonstrates that the treatment of storm water runoff from WCRC's roads within the City of Detroit constitutes a "service rendered" within the meaning of the Michigan Revenue Bond Act of 1933. Moreover, we believe that this conclusion is fully supported by the policies underlying the Revenue Bond Act of 1933, by Michigan case law, and by the case law in other jurisdictions which have addressed this issue.
 
 C.
 
 32
 At the outset, we note that, on its face, the language of section 18 of the Revenue Bond Act is both broadly worded and mandatory. It states that, "free service shall not be furnished by a public improvement to" a public corporation and "the reasonable cost and value of any service rendered to a public corporation ... by a public improvement shall be charged against the public corporation and shall be paid for as the service accrues...." Mich.Comp.Laws Ann. Sec. 141.118. Section 21 of the Act also states that in fixing rates for services, "[t]he rates shall be sufficient to provide for the payment of the expenses of administration and operation and the expenses for the maintenance of the public improvement as may be necessary to preserve the same in good repair and working order...." Mich.Comp.Laws Ann. Sec. 141.121. Quite clearly, these provisions are necessary in order that a public corporation, such as the City of Detroit and DWSD, may "purchase, acquire, construct, improve, enlarge, extend, or repair public improvements" such as the sewer system in question. In particular, section 18 is apparently designed to insure that those who use or otherwise benefit from a public improvement bear their fair share of the costs attributable to their use of that improvement. Significantly, section 34 of the Act commands that the Act "shall be liberally construed to effect the purposes hereof," and one of the principal purposes of the Act is to preserve and promote "the public health, safety, convenience and welfare of the counties, cities, incorporated villages, townships, school districts, port districts, and metropolitan districts of the state of Michigan." Mich.Comp.Laws Ann. Sec. 141.134.[6]
 
 
 33
 Although no Michigan case has addressed the precise issue involved here,[7] the Michigan Supreme Court has recognized that no municipality has the right to the use of another municipality's sewage disposal system without paying for it. See City of Detroit v. City of Highland Park, 326 Mich. 78, 39 N.W.2d 325, 330 (1949); City of Detroit v. Village of Highland Park, 186 Mich. 166, 152 N.W. 1002, 1007 (1915).[8] We note, moreover, that there are a number of cases which have specifically upheld the right of a municipality to charge those who use a municipality's sewer system for the disposal or treatment of storm water runoff.
 
 
 34
 In Teter v. Clark County, 104 Wash.2d 227, 704 P.2d 1171 (1985), the Washington Supreme Court held that a state statute, similar to that involved here, authorized a city and county to act under its police power in order to impose charges on property owners whose properties contributed to an increase in surface water runoff. In reaching this conclusion, the court emphasized that "the charge is properly characterized as a charge imposed to implement a health or safety law and is valid, even though appellants do not receive any specific 'service.' " 704 P.2d at 1177 (emphasis in original). The court also emphasized that, inasmuch as the county's decision to impose the charges was taken pursuant to its police power, the court's scope of review was limited to the "arbitrary and capricious" standard. Id. at 1178.
 
 
 35
 The Pennsylvania Supreme Court reached a similar result in Gericke v. City of Philadelphia, 353 Pa. 60, 44 A.2d 233 (1945). In that case, a state statute authorized cities to collect sewerage charges "apportioned equitably among the properties served by" the sewerage system. After the city began levying sewer charges pursuant to this statute, a class action was brought alleging, inter alia, "that users should not pay for storm water disposal." 44 A.2d at 236. In rejecting this argument, the court noted:
 
 
 36
 "It seems to us that the city's figure of 25% of the cost of construction of the collection system as the percentage to be allotted to storm water collection is based upon sound evidence, and we have accepted it." After considering additional facts, the learned judge concluded that "it will be seen that City Council was not thinking of storm water drainage when it passed the Ordinance, and that this is not being charged for in the sewer rental." We wish to add that whether or not council intended to make the expense of disposing of storm water an element in the sewerage charge, the direct benefit to the property served amply warrants the city in including it in the charge.
 
 
 37
 Id. at 238 (emphasis added) (quoting lower court opinion). See Bexar County v. City of San Antonio, 352 S.W.2d 905 (Tex.Civ.App.1961), where the Texas Court of Appeals upheld a city's right to levy charges against a county for the use of the city's sewer system, noting, "It has been decided that a city may make a reasonable charge for the benefits received by those who use its sewers, sufficient to operate and maintain such sewer system and to provide for replacements and future extensions thereof." Id. at 907 (citing Cooley on Taxation, 636, in support of the proposition). Cf. Young Mens Christian Association v. Rochester Pure Water District, 37 N.Y.2d 371, 372 N.Y.S.2d 633, 334 N.E.2d 586 (1975).
 
 
 38
 There can be little question, therefore, regarding the general principle that a municipality, acting pursuant to a proper delegation of authority, may charge those who use or otherwise benefit from its sewer system, even though such use or benefit is based upon the disposal or treatment of storm water running into the municipality's sewers. Indeed, some courts have specifically recognized that a benefit is necessarily conferred upon those properties which enjoy storm water runoff into a municipal sewer system. According to the Colorado Supreme Court: "The purpose of a storm sewer is to carry off flood waters. Each lot in the district is benefitted by being relieved from the dangers and damages which may be occasioned from storm waters, more or less common to the district in which it is situated. Each tract ordinarily augments the aggregate volume of storm waters in a district, in the proportion that its area bears to the entire area of lots in the district." City of Denver v. Dumars, 33 Colo. 94, 80 P. 114 (1905). Similarly, the Ohio Supreme Court states: "[I]t is so plain and clear that some benefit must accrue to the railway company by reason of a storm sewer system which will properly care for storm water, and this is a matter of such general and common knowledge, that the courts may well take judicial notice of that fact. The fact that the railway company has found it convenient to construct drain tile on each side of its track, and beneath its track, connecting the same up with the sewer system, establishes beyond controversy that some benefit accrues." Ohio E.R. Co. v. Greenville, 110 Ohio St. 31, 143 N.E. 193 (1924).
 
 
 39
 Likewise, we believe that an examination of the undisputed facts in the instant case demonstrates beyond question that WCRC receives a benefit from the disposal and treatment of the storm water running off WCRC's roads and into the City of Detroit's sewer system, and as such, we believe that this is a "service rendered" within the meaning of the Revenue Bond Act of 1933. As already noted, WCRC presently maintains over 83.28 linear miles of roads located within the City of Detroit. There is no question, moreover, as to WCRC's statutory duty to keep the roads under its jurisdiction "in reasonable repair, so that they shall be reasonably safe and convenient for public travel." Mich.Comp.Laws Ann. Sec. 224.21. One aspect of this duty would presumably include a requirement that WCRC provide adequate and appropriate drainage for roads under its jurisdiction. Indeed, WCRC concedes that it has obtained drainage for some of its roads "by tapping into the DWSD sewer system." Appellees' Brief at 6. Plainly, WCRC is benefitted by being relieved from the dangers and damages which may be occasioned by flooding from storm waters and which might, in the absence of drainage into the DWSD's sewer system, result in liability, or at least in damage to WCRC's roads. Moreover, we find it unimportant that "WCRC does not create this volume of flow and cannot be held directly responsible for it." 594 F.Supp. at 577. Obviously, no one is responsible for this flow. The fact remains, however, that this water has to go somewhere, especially if WCRC is to keep its roads in reasonable repair and, for at least some of this water, WCRC has obtained drainage by tapping into the DWSD sewer system.
 
 
 40
 There is another reason why we believe that the drainage of storm water runoff from WCRC's roads into DWSD's sewer system constitutes a "service rendered" within the meaning of the Revenue Bond Act of 1933. Prior to the EPA enforcement action in 1977, the City of Detroit was not required to provide treatment to storm water runoff that went through its sewers and flowed into the Detroit River. Since 1977, however, the Detroit Wastewater Treatment Plant has been required to provide secondary treatment to flows up to 805 million gallons per day. In addition, the enactment of the Federal Water Pollution Control Act made it unlawful for the Detroit treatment plant to discharge any pollutant directly into the Detroit River without treatment. See 33 U.S.C. Sec. 1311(a). The Act also requires that all municipally owned treatment works achieve full secondary treatment by July 1, 1977. As a result, since 1977, Detroit was for the first time legally required to render full secondary treatment to storm water flows.
 
 
 41
 The storm water which constitutes the runoff from WCRC's roads may have come from God or nature in the first place, just as all water entering the DWSD's sewer system must have at one time or another. Nevertheless, the refuse or foreign matter that water accumulates as it courses through WCRC's roads must now be subjected by law to primary and secondary treatment to the extent such runoff enters Detroit's sewage treatment system. And to that extent, at least, WCRC is a user of the facility provided by DWSD. Any effort somehow to rely upon a different definition of "user" is essentially a matter of semantics more than of substance, given the state statutory scheme.
 
 
 42
 The drainage and treatment of storm water from WCRC's roads into the City of Detroit's sewer system constitutes a "service rendered" within the meaning of section 18 of the Revenue Bond Act of 1933, Mich.Comp.Laws Ann. Sec. 141.118. The City of Detroit has a statutory right to charge WCRC for "the reasonable cost and value" of this service. We conclude that the district court's finding that WCRC receives no benefit from this service is clearly erroneous.
 
 
 43
 Accordingly, the district court's judgment is REVERSED and REMANDED for further proceedings consistent with this opinion.[9]
 
 
 
 *
 Honorable Leroy J. Contie took senior status on July 1, 1986
 
 
 [1]
 Prior to 1977, Detroit's original wastewater treatment plant provided for primary treatment only. The original wastewater treatment given to flows received at the plant provided for removal of solids by a simple gravity method. The final discharge was simply chlorinated to provide disinfection
 The present Detroit wastewater treatment plant is now required to provide secondary treatment to flows up to 805 million gallons per day. Flows over the secondary treatment capacity, approximately 200 million gallons per day, receive primary treatment. Flows over the level of 1 billion gallons are not treated but are diverted directly to the Detroit River. The enactment of the Federal Water Pollution Control Act made it unlawful for the Detroit treatment plant to discharge any pollutant directly into the Detroit River without treatment. 33 U.S.C. Sec. 1311(a). The Act also required that all municipally owned treatment works achieve full secondary treatment by July 1, 1977. 33 U.S.C. Sec. 1311(b)(1)(B). Thus, under the Act, Detroit was for the first time legally required to render full secondary treatment to storm water flows. Appellant's Brief at 7.
 
 
 [2]
 DWSD initially continued its practice of not charging the City of Detroit for treatment of water running off streets within the City of Detroit's jurisdiction. The cost of treating this water from City streets was allocated among the three classes that were paying for runoff in the City of Detroit. As a result, in addition to being charged for the estimated cost of water running off roads within WCRC's jurisdiction, WCRC was charged a proportionate share of the cost of treating storm water running off the City streets. According to DWSD, however, since July 1, 1983, no portion of the treatment costs for runoff from City streets has been allocated to WCRC as part of its storm water treatment charges for its roads. Appellant's Brief at 9. DWSD states that these costs are now borne solely by the City of Detroit residential and nonresidential users of the Detroit system
 
 
 [3]
 In an earlier but related action, DWSD sought to recover storm water treatment charges from WCRC and the Michigan Department of Transportation based upon its claim that their refusal to pay such charges was in violation of the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1284(b)(1)(A) and related regulations at 40 C.F.R. Sec. 35.929-1. The district court determined, however, that Congress did not intend to create a private cause of action in FWPCA Sec. 1284(b)(1)(A) and therefore concluded that there is no federal question which would provide the court with subject matter jurisdiction. See City of Detroit v. Michigan, 538 F.Supp. 1169 (E.D.Mich.1982). This issue is not before this court
 
 
 [4]
 The district court's ancillary jurisdiction over the City's state law claims was based upon the court's creation of a receivership and the appointment of the Mayor of Detroit as Administrator who was charged with managing the wastewater treatment plant in compliance with the Federal Water Pollution Control Act. United States v. City of Detroit, No. 77-71100 (E.D.Mich.1978). The district court established jurisdiction on the ground that the City's complaint was brought to accomplish the ends of the receivership and that subject matter jurisdiction was therefore vested in the court under established principles of ancillary jurisdiction. City of Detroit v. Michigan, 538 F.Supp. 1169 (E.D.Mich.1982). The court's jurisdiction is not questioned in this appeal. Although subject matter jurisdiction is always open for our review, notwithstanding the parties' agreement on the issue, we conclude that the district court's assumption of ancillary jurisdiction is consistent with our recent decision in County of Oakland v. City of Berkley, 742 F.2d 289 (6th Cir.1984)
 
 
 [5]
 It is clear that the WCRC is a public corporation within the meaning of the Act
 The term "public corporation" shall be construed to mean any county, city, village, township, school district, port district or metropolitan district, of the state of Michigan, or any combination thereof when authorized by law to act jointly, or any authority created by or pursuant to an act of the legislature.
 Mich.Comp.Laws Ann. Sec. 141.103(a) (emphasis added). Since the Wayne County Road Commission is an "agency" or "instrumentality" of Wayne County, the WCRC is clearly a "public corporation" within the meaning of the Act.
 
 
 [6]
 There can be no question that the construction and improvement of a sewage disposal system is essential to the public health, safety, and welfare. See Cohn v. County of Oakland, 354 Mich. 180, 92 N.W.2d 502, 507 (1958) ("The sewage disposal system is a project designed for the protection of the public health, and as such is within the scope of the police power."); see also New Orleans Gas Light Co. v. Drainage Comm'n, 197 U.S. 453, 460, 25 S.Ct. 471, 473, 49 L.Ed. 831 (1905) ("The drainage of a city in the interest of the public health and welfare is one of the most important purposes for which the police power can be exercised.")
 
 
 [7]
 We note that a number of cases have upheld the levying of charges and rates for various kinds of "services" under the Revenue Bond Act of 1933. In Seltzer v. Sterling Township, 371 Mich. 214, 123 N.W.2d 722 (1963), the Michigan Supreme Court upheld a privilege fee of $150 per lot fixed by a township board for the acquisition of capital equipment for a township water system. In upholding this fee, the court stated:
 The flat rate charge here provided as a "privilege fee" comes within the term "rates" defined in the Revenue Bond Act of 1933, being within the terms "charges, fees, rentals and rates which may be fixed and imposed for the services, facilities and commodities furnished by any public improvement."
 
 
 [123]
 N.W.2d at 725. In City of North Muskegon v. Bolema Const. Co., 335 Mich. 520, 56 N.W.2d 371 (1953), the Michigan Supreme Court upheld the right of a municipality to recover the sum of $100 for a permit fee for a sewer connection. Here, the court stated:
 In our opinion a lateral consisting of sewer pipe and fittings running from a sewer main to the property line of the user is a necessary part of the sewerage system and as such is a service or facility within the meaning of the Act.
 
 
 [56]
 N.W.2d at 374. See also Ripperger v. City of Grand Rapids, 338 Mich. 682, 62 N.W.2d 585 (1954); Farmington Township v. Warrenville State Bank, 185 F.2d 260 (6th Cir.1950)
 Although these cases are not precisely in point, they do indicate an attitude on the part of Michigan courts which is generally supportive of a municipality's right to levy charges for services rendered by a public improvement. This attitude, in turn, provides us with guidance in analyzing the precise issue involved here consistent with Michigan law.
 
 
 [8]
 Although, strictly speaking, these cases involve the disposal of sewage, rather than the disposal of surface or storm water drainage, there may be little point in distinguishing between the two. Indeed, as one commentator notes:
 Broadly speaking, sewage is that which is carried off or drained from a city or town by means of sewers. "Sewage includes the water by which the foul matter, which passes through the drains, conduits, or sewers of a town, is carried off, the wastewater of baths, warehouses, and other domestic operations, and of the greater part of the surface drainage of the area drained. Water polluted by the filth from buildings and streets is sewage." (Emphasis added).
 
 
 [11]
 E. McQuillin, Municipal Corporations Sec. 31.04 at 158 (3d ed. 1983) (emphasis added) (citation omitted). See Clay v. City of Grand Rapids, 60 Mich. 451, 458, 27 N.W. 596, 599 (1886), where the Michigan Supreme Court states:
 There is nothing in the nature of a sewer which excludes it from being made, in whole or in part, out of a natural water-way. Such is a very common practice, and the sewerage, under the ancient system of the English sewer commissioners, was chiefly in natural streams, which were variously improved or confined for the purpose. Neither is sewerage necessarily, if it is generally, intended as an escape for filthy water. It includes all kinds of drainage and water discharge (emphasis added).
 
 
 [9]
 We express no opinion as to WCRC's claims of insufficient notice of the 1980-81 rate agreement, and the unreasonableness of the rates, since the district court has not yet decided those issues